CC-1999-37                                              1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Eurípides Rodríguez Báez, Liduvina Ríos Torres y la Sociedad Legal de Gananciales compuesta por Ellos y en representación de su Hija Menor, Lizarry Rodríguez Ríos      Recurridos<br><br>            v.<br><br>Nationwide Insurance Company y Copy Corp., Inc.     Peticionarias | Certiorari<br><br>2002 TSPR 52<br><br>156 DPR ____ |

Número del Caso: CC-2000-46


Fecha: 18/abril/2002


Tribunal de Circuito de Apelaciones:
                         Circuito Regional I


Juez Ponente:
                    Hon. Gilberto Gierbolini


Abogadas de la Parte Peticionaria:
                    Lcda. Marta Quiñones Zambrana
                    Lcda. Victoria D. Pierce King


Abogado de la Parte Recurida:
                    Lcdo. J. E. Santiago Rosado


Materia: Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eurípides Rodríguez Báez,
Liduvina Ríos Torres y la
Sociedad Legal de Gananciales
compuesta por Ellos y en
representación de su Hija
Menor, Lizarry Rodríguez Ríos

    Recurridos                    CC-2000-46        Certiorari

       v.

**Nationwide Insurance Company y Copy Corp.,
Inc.**

    **Peticionarias**

**Opinión del Tribunal emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO**

**San Juan, Puerto Rico a 18 de abril de 2002.**

**I**

**El Sr. Eurípides Rodríguez Báez sufrió varias lesiones como consecuencia de un accidente en el cual su vehículo fue impactado por la parte posterior por un camión de la codemandada Copy Corp., Inc. Por estos hechos, el Sr. Rodríguez Báez, su esposa Liduvina Ríos Torres, la sociedad legal de bienes gananciales por ellos compuesta y su hija Lizarry Rodríguez Ríos (en adelante "los recurridos" o "la parte recurrida"), presentaron ante el Tribunal de Primera Instancia (TPI) una acción por los daños y perjuicios sufridos, en contra del conductor del camión, Sr. Domingo Ortiz**

Díaz, Ofiponce, Inc., Copy Corp., Inc. y Nationwide Insurance Corp. (en adelante Nationwide). En esencia, la controversia se circunscribió a la determinación de daños ya que, previo a la adjudicación del caso, Nationwide aceptó la responsabilidad por los hechos que dieron inicio a este pleito.[1]

Luego de celebrada la vista en su fondo, en la cual se presentó abundante prueba documental y los testimonios vertidos por las partes y ocho (8) peritos[2], el 28 de diciembre de 1995, el TPI dictó sentencia a los fines de determinar las partidas de daños a ser concedidas a los recurridos. El TPI entendió probados los hechos que a continuación expresamos.

A la fecha de la adjudicación del caso, el recurrido Sr. Eurípides Rodríguez Báez se desempeñaba como vendedor de seguros desde hacía veinticinco (25) años y era agente general de varias compañías de seguros de vida. Obtuvo el grado de Bachiller de la Universidad de Puerto Rico y ha cursado Estudios Especializados en el área de seguros. Además, ha obtenido las licencias o grados siguientes: Career Life Underwriter del American College (CLU); Charter Financial Consultant (CFC); licencia de vendedor de seguros de vida, de seguros misceláneos y para la venta de anualidades variables expedida por la Oficina del Comisionado de Seguros de Puerto Rico.

En cuanto a los alegados sufrimientos y angustias mentales del Sr. Rodríguez Báez, el TPI determinó que los dolores de cabeza, cuello y espalda, espasmos, dificultades para doblarse, su ánimo decaído, insomnio, pesadillas, depresión, irritabilidad y ansiedad, no eran exagerados y que no albergaba dudas que los mismos eran legítimos. Además, concluyó que ciertamente ha sufrido grandes dolores físicos y trastornos emocionales. Luego de aquilatar la prueba, entendió que los trastornos y el cuadro médico reflejados por el Sr. Rodríguez Báez fueron producidos, en su mayoría, por el accidente.

Previo a los hechos concernidos, el Sr. Rodríguez Báez no padecía de enfermedad o dolencia significativa, su presión arterial era normal; sin embargo, conforme a la prueba presentada, a raíz del accidente éste ha venido padeciendo de hipertensión.

El psiquiatra del Sr. Rodríguez Báez, quien fue interrogado ampliamente, sostuvo que al momento de la vista lo había atendido en quince (15) ocasiones y que el tratamiento brindado incluía psicoterapia, terapia de pareja y farmacología (medicamentos para inducir al sueño, antidepresivos, etc.). Los médicos le han tratado sobre su idea de un posible suicidio, lo que ha contemplado a causa de su trauma por la disminución de sus ingresos.[3]

---

[1] A esos fines, el 1 de octubre de 1993, el TPI emitió una *Sentencia Parcial sobre Responsabilidad*. Apéndice de la Petición de *Certiorari*, pág. 63.

[2] Por la parte recurrida declararon: un Doctor en Economía, un Doctor Quiropráctico, un Doctor en Medicina Interna, dos Neurólogos y dos Psiquiatras. Por Nationwide declaró un Neurólogo. Sentencia de 28 de marzo de 1995 emitida por el TPI, escolio 1; Apéndice de la Petición de *Certiorari*, pág. 63.

[3] Los galenos entienden que esta idea no es fija y no creen que sea grave en su paciente.

Antes del accidente, el Sr. Rodríguez Báez realizaba las labores propias del hogar, tales como pintar la casa, cortar la grama y mantenimiento en general; labores que ya no puede realizar a causa de las dolencias que le aquejan. Inclusive, hasta la manera en que conduce su vehículo ha cambiado, ahora lo hace con temor, desespero y aprehensión, y no le es posible manejar por períodos prolongados de tiempo.

Su familia también se ha visto afectada. Al día de la vista en su fondo, su hija Lizarry Rodríguez Ríos estaba terminando su Bachillerato en Piano, con miras de continuar sus estudios de maestría en música. El Sr. Rodríguez Báez acompañaba a su hija a la mayoría de sus presentaciones musicales y actividades deportivas, de las que hoy día tanto el padre como su hija se han visto privados de disfrutar juntos. El día del accidente, cuando Lizarry regresó a su casa y vio el carro de su padre chocado, pensó que éste podría estar muerto o gravemente lesionado.

Conforme quedó establecido, la familia disfrutaba de una vida social activa. Asistían a las convenciones de la compañía para la cual el Sr. Rodríguez Báez trabajaba y en sus vacaciones visitaban de cuando en cuando distintos países. Según determinara el foro de instancia, "desde el accidente para acá no han podido asistir ni a los Paradores en Puerto Rico y mucho menos a viajes fuera del país."[4] Al describir a su esposo, la Sra. Liduvina Ríos Torres expresó: "se avejentó, el carácter lo tiene insoportable, antes era una persona amable, cordial[,] ahora está encerrado en su mundo".[5] Por ello, la Sra. Ríos Torres está convencida de que su esposo se ha afectado mentalmente, e inclusive teme por su integridad física.

En su matrimonio, el Sr. Rodríguez Báez y la Sra. Ríos Torres procrearon otra hija, quien padece de autismo desde su nacimiento y no figura como demandante en este pleito. Antes de los sucesos que dan inicio al caso de autos, el matrimonio planificaba ponerla bajo cuidado médico o atención especializada; plan que se ha visto tronchado por la falta de recursos económicos.

Las relaciones matrimoniales se han afectado, incluso las relaciones íntimas entre esposo y esposa, no sólo a causa de la condición médica del Sr. Rodríguez Báez, sino también por la preocupación derivada de la disminución sustancial de ingresos.

En síntesis, la institución familiar ha sido trastocada, ocasionando a sus miembros trastornos emocionales, en particular a la esposa del lesionado, la Sra. Ríos Torres, y a su hija, Lizarry Rodríguez Ríos.

Respecto a la capacidad y manera de generar ingresos, quedó establecido que el Sr. Rodríguez Báez realizaba sus ventas de seguros de vida mediante el contacto personal con potenciales clientes. Éste trabajaba seis días por semana y hacía de tres a cuatro propuestas

---

[4] Sentencia de 28 de marzo de 1995 emitida por el TPI; Apéndice de la Petición de *Certiorari*, pág. 77.

[5] *Íd.*

por día.  A la fecha de las determinaciones del foro de instancia, las visitas a sus clientes se redujeron prácticamente a cero.

La mayoría de las ventas de seguros de vida que realizaba el Sr. Rodríguez Báez las hacía para la Confederación del Canadá.  Mientras este pleito estaba pendiente para su adjudicación, esta compañía estaba siendo intervenida por el Comisionado de Seguros del Estado de Michigan y también en Canadá.  En vista de que el Sr. Rodríguez Báez estaba capacitado para vender seguros de vidas de otras de las compañías de seguro que operan en Puerto Rico, el TPI expresó lo siguiente:  "[e]l asunto no es un problema del seguro que él, [*sic*] vende o de la compañía que represente[,] sino de su capacidad para venderlo **independientemente quien [*sic*] sea la compañía.**"[6]

En la determinación de la pérdida económica por concepto de lucro cesante, pretérito y futuro, el TPI tomó como base el ingreso bruto generado por el Sr. Rodríguez Báez los tres años previos al accidente y los generados los tres años posteriores, conforme a las planillas de contribución sobre ingresos para dichos años.[7]  Luego de calcular la pérdida económica promedio anual[8], adjudicó una compensación de $234,800.00 por concepto de lucro cesante pretérito[9], y $327,714.00 por concepto de lucro cesante futuro[10].

---

[6] *Íd.*, a la pág. 82.  (Énfasis en el original.)

[7] Conforme a las planillas de contribución sobre ingresos rendidas por los recurridos, el ingreso bruto generado fue el siguiente:

Previo al accidente

| | | |
|---|---|---|
| a) | 1987 | $124,055.63 |
| b) | 1988 | $122,765.61 |
| c) | 1989 | $116,747.18 |
| | Total | $363,568.42 |

Posterior al accidente

| | | |
|---|---|---|
| a) | 1990 | $67,090.12 |
| b) | 1991 | $70,137.84 |
| c) | 1992 | $50,225.72 |
| | Total | $187,463.68 |

[8] **Pérdida económica promedio anual:**

Ingreso promedio antes del accidente menos el ingreso promedio luego del accidente

($363,568.42 ÷ 3) − ($187,463.68 ÷ 3) = $58,704.91

[9] **Lucro cesante pretérito:**

Pérdida económica promedio anual multiplicada por los años transcurridos desde la fecha del accidente hasta la fecha de la sentencia (4 años)

$58,704.91 × 4 = $234,800.00

[10] **Lucro cesante futuro:**

*Expectativa de vida útil productiva del lesionado*

Respecto a los daños físicos, angustias y sufrimientos mentales y morales, incluyendo los pasados, presentes y futuros del Sr. Rodríguez Báez, el TPI le concedió una compensación de $110,000.00. Por otro lado, restó de las compensaciones concedidas al Sr. Rodríguez Báez la cantidad de $3,000.00 por concepto de la exención concedida por la Ley Núm. 138 de 26 de junio de 1968, 9 L.P.R.A. sec. 2051 *et seq.*, conocida como la Ley de Protección Social por Accidentes de Automóviles. Por las angustias y sufrimientos mentales y morales, incluyendo los pasados, presentes y futuros, el TPI concedió a la Sra. Ríos Torres y a su hija Lizarry Rodríguez las cantidades de $65,000.00 y $40,000.00, respectivamente.

Luego de varios trámites post-sentencia, Nationwide acudió ante el Tribunal de Circuito de Apelaciones (TCA) mediante escrito de apelación presentado el 3 de enero de 1997. Nationwide solicitó la revocación de la sentencia emitida por el TPI. En síntesis, alegó que el TPI erró al calcular las partidas de lucro cesante: primero, al utilizar como base el ingreso bruto generado por las ventas de seguros, sin descontar las partidas de gastos incurridos para producir los mismos; segundo, al no restar los pagos por concepto de patentes municipales; tercero, al no considerar los días libres y sábados y domingos al determinar la expectativa de vida útil; cuarto, al no considerar la merma en el negocio por causas ajenas al accidente; y quinto, al tomar como base los ingresos de tres años en la determinación de ingresos promedios, en vez de utilizar los generados en un período de cuatro años. Adujo, además, que el TPI incidió al conceder las partidas por daños personales, ya que en su criterio éstas son excesivas.

Luego de un examen de la prueba presentada ante el TPI, el 17 de junio de 1999, el TCA dictó una sentencia en la que confirmó la emitida por el foro de instancia. En cuanto a la determinación del lucro cesante, el TCA concluyó que la misma fue hecha conforme a derecho, y que la teoría de Nationwide es una novel y no ha sido reconocida en nuestro ordenamiento jurídico. Respecto a las demás partidas de daños concedidas, el TCA expresó lo siguiente: "[u]n examen detenido y minucioso de toda la prueba presentada en el presente caso, especialmente la de carácter pericial, nos convence de que la determinación que hiciera el tribunal de instancia en cuanto a los daños de los co-demandantes y la cuantía concedida por

---

Edad de retiro promedio (65 años; *Suro v. E.L.A.*, 111 D.P.R. 456), menos edad del trabajador al dictar sentencia
65 años - 57.63 años = 7.37 años

continúa...

... 10 continuación

*Valor presente de un dólar pagadero anualmente*

El factor equivalente al valor presente de los futuros pagos descontados a una tasa de interés de 6% durante un período de 7 años (expectativa de vida útil productiva), es 5.5824

*Lucro cesante futuro*

Pérdida económica promedio multiplicada por el valor presente de un dólar pagadero anualmente

dicho concepto es una que está ampliamente sostenida por la referida prueba y no corresponde a este Tribunal intervenir con la misma."[11]

Inconforme con el dictamen del TCA, Nationwide recurre ante nos mediante petición de *certiorari* presentada el 19 de enero de 2000. Alega que el foro intermedio apelativo cometió los errores siguientes:

A. Erró el Tribunal de Circuito de Apelaciones al utilizar el ingreso bruto del demandante, quien es empleado por cuenta propia, como base del cálculo del lucro cesante concedido.

B. Erró el Tribunal de Circuito de Apelaciones en el cálculo del lucro cesante cuando no ajustó la suma correspondiente al pago de la patente municipal.

C. Erró el Tribunal de Circuito de Apelaciones en no considerar en la aplicación del lucro cesante la merma en el negocio por causas ajenas al accidente.

D. Erró el Tribunal de Circuito de Apelaciones en el cálculo de lucro cesante cuando utilizó erróneamente el promedio de tres años en vez de cuatro años disponibles.

E. Erró el Tribunal de Circuito de Apelaciones en la compensación concedida por los daños, por ser ésta excesiva y exagerada.

Mediante Resolución de 25 de febrero de 2000, expedimos el auto de *certiorari*. Perfeccionado el recurso, luego de la comparecencia de las partes, resolvemos.

## II

La estimación y valorización de daños es una gestión o tarea difícil y angustiosa, ello debido al cierto grado de especulación en la determinación de éstos y por incluir a su vez elementos subjetivos tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. Véase, *Nieves Cruz v. U.P.R.*, res. el 31 de mayo de 2000, 151 D.P.R. __, 2000 T.S.P.R. 78, 2000 J.T.S. 91, a la pág. 1211; *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451 (1985); *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647 (1975). Así, en *Urrutia v. A.A.A.*, supra, a la pág. 647-648, expresamos lo siguiente:

> [b]ajo la fórmula amplia de responsabilidad consagrada en el Art. 1802 del Código Civil (31 L.P.R.A. sec. 5141), no existe una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la valoración del dolor físico y mental humano y permita, mediante la aplicación de unas teclas o el oprimir unos botones, obtener el resultado final apropiado. Esta función descansa sobre el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia y de conciencia humana.[12]

Reiteradamente hemos expresado que, dado que el foro de instancia es quien ha estado en contacto directo con la prueba, en especial la prueba testifical, los tribunales apelativos deberán abstenerse de intervenir respecto a las cantidades concedidas a menos que éstas sean ridículamente bajas o exageradamente altas, ello, fundado en criterios de estabilidad y de

---

$58,704.91 × 5.5824 = $327,714.00

[11] Sentencia del TCA de 17 de junio de 1999; Apéndice de la Petición de *Certiorari*, pág. 29.

[12] Véase, además, *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39 (1982); *Publio Díaz v. E.L.A.*, 106 D.P.R. 854, 867 (1978).

respeto a los tribunales de primera instancia. *Íd.*; Véase además, *Nieves Cruz v. U.P.R.*, supra; *Publio Díaz v. E.L.A.*, 106 D.P.R. 854, 868 (1978), *Baralt v. Báez*, 78 D.P.R. 123, 127 (1955); *Rodríguez v. American Railroad Co.*, 43 D.P.R. 493 (1932). Por ende, la cuantificación necesaria y justa para compensar los daños queda en el sano juicio, la experiencia y discreción del juzgador. *Concepción Guzmán v. A.F.F.*, 92 D.P.R. 488, 502 (1965); *Infante v. Leith*, 85 D.P.R. 26 (1962); *Arcelay v. Sánchez*, 77 D.P.R. 824 (1955). "Empero, señaladas y sometidas **a nuestra consideración** circunstancias comprobadas que ameritan una modificación de cuantía, procederemos a ello siguiendo los criterios antes mencionados." *Urrutia v. A.A.A.*, supra, a la pág. 648; *Publio Díaz v. E.L.A.*, supra. (Énfasis suplido.) De lo contrario, reiteramos la norma de abstención judicial para intervenir con la apreciación de la prueba que hizo el foro de instancia en ausencia de pasión, prejuicio, error manifiesto o parcialidad. *Colón González v. Tienda Kmart*, res. el 26 de junio de 2001, 154 D.P.R. ____, 2001 T.S.P.R. 95, 2001 J.T.S. 98, pág. 1484; *Trinidad García v. Chade,* res. el 18 de enero de 2001, 153 D.P.R. ___, 2001 T.S.P.R. 7, 2001 J.T.S. 10, pág. 793; *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39, 50 (1982); *Pueblo v. Turner Goodman*, 110 D.P.R. 734, 738 (1981); *Pueblo v. Franceschini Sáez*, 110 D.P.R. 794, 796 (1981); *Pueblo v. Torres Montañez*, 106 D.P.R. 125, 130-131 (1977).

El lucro cesante es aquella partida de daño que debe ser resarcida por concepto de la pérdida de ingresos ocasionada al perjudicado y la disminución de su capacidad productiva. *Rodríguez v. Ponce Cement Corp.*, 98 D.P.R. 201 (1969). Como elemento de daño, el reclamante debe establecer que la interrupción y cese de sus ingresos fue ocasionada por las actuaciones del demandado. *Publio Díaz v. E.L.A.*, supra, a la pág. 870. "Propiamente hablando, no es una indemnización por lesiones o enfermedad ya que éstas tienen el propósito básico de restaurar el daño físico causado, pero como no puede hacerse en especie, se sustituye con dinero." *Íd.*; *Robles Ostalaza v. U.P.R.*, 96 D.P.R. 583 (1968).

Siguiendo el pensamiento del jurista Santos Briz, en *Velázquez v. Ponce Asphalt*, supra, a la pág. 48, aclaramos que:

> "[e]l lucro cesante se trata de un perjuicio sufrido que consiste en una ganancia futura frustrada **que con cierta probabilidad era de esperar según el curso normal, ulterior de las cosas. El perjudicado no tiene que demostrar con certeza absoluta que se habrían realizado las ganancias. Para distinguir entre un interés verdadero y uno inseguro o incierto, hay que distinguir entre la mera posibilidad y la probabilidad de una** ganancia futura **teniendo en cuenta que tal vez en algún caso sea indemnizable la mera posibilidad.**"[13]

En *Vda. de Seraballs v. Abella Hernández*, 90 D.P.R. 368 (1964), nos enfrentamos a la estimación y valorización de lucro cesante en una acción de daños y perjuicios por los actos del demandado privando de la vida al esposo y padre de las demandantes. Al resolver, tomamos el estimado de los ingresos anuales del causante y le restamos la contribución sobre ingresos estimada. Del remanente deducimos una tercera parte por concepto de los gastos propios del causante, obteniendo así una cantidad "x". Tras estimar la expectativa de vida productiva

del causante, multiplicamos la cantidad "*x*" por el factor obtenido en la tabla actuarial para el valor presente de un dólar pagadero anualmente, descontado a una tasa de interés de 6% durante el período de años de expectativa de vida productiva del causante.  El resultado de dicha operación matemática constituyó la partida de lucro cesante a ser concedida a los legitimados activos.

Luego en *Rodríguez v. Ponce Cement Corp.*, supra, y en *Sánchez v. Liberty Mutual Ins. Co.*, nos abstuvimos de deducir la partida de contribuciones sobre ingresos en la determinación de lucro cesante.  Al respecto, en *Publio Díaz v. E.L.A.*, supra, a la pág. 869, expresamos lo siguiente: "a los fines de despejar cualquier duda al respecto, reiteramos la regla de que al estimarse la pérdida económica relacionada con el 'lucro cesante' no debe deducirse la contribución."

Al estimar y valorizar la partida de lucro cesante, permea esencialmente un elemento de razonabilidad. Véase, *Suro v. E.L.A.*, 111 D.P.R. 456, 460 (1981); *Velázquez v. Ponce Asphalt*, supra, a la pág. 49, *Publio Díaz v. E.L.A.*, supra; *Vda. de Delgado v. Boston Ins. Co.*, 99 D.P.R. 714, 729 (1971); *Rodríguez v. Ponce Cement Corp.*, supra.  Anteriormente hemos expresado que, las ecuaciones matemáticas utilizadas en decisiones previas no constituyen una fórmula fija y rígida que deba aplicarse de forma estricta en toda determinación de lucro cesante.  *Suro v. E.L.A.*, supra; *Publio Díaz v. E.L.A.*, supra; *Rodríguez v. Ponce Cement Corp.*, supra.  Las fórmulas utilizadas en el pasado no pretenden exponer de manera absoluta todos los criterios matemáticos a tomarse en cuenta. Éstas están sujetas a los ajustes necesarios para que respondan a las situaciones del momento.  *Suro v. E.L.A.*, supra; Véase además, *Publio Díaz v. E.L.A.*, supra.  Lo realmente esencial es que la base utilizada al hacer los cómputos sea una razonable en aras de una determinación prudente.  *Rodríguez v. Ponce Cement Corp.*, supra.

Al respecto, en *Vda. de Delgado v. Boston Ins. Co.*, supra, señalamos lo siguiente:

[e]s necesario aclarar que los daños por lucro cesante no se deben determinar exclusivamente a base de la ecuación matemática a que se ha hecho referencia en los anteriores casos.  La misma es sólo uno de los factores, en adición a todas las circunstancias del caso que se puede tomar en consideración, a los fines de determinar la razonabilidad de la cuantía en que se estima la pérdida por el lucro cesante.[14]

III

Al disponer del primer error señalado, nos corresponde resolver si en la determinación de la pérdida económica por concepto de lucro cesante de un agente de seguros, debe deducirse del ingreso bruto devengado y producto de la venta de seguros, aquellos gastos necesariamente incurridos para generar el mismo.

Según expusiéramos anteriormente, la norma vigente en materia de lucro cesante toma como base los ingresos o ganancias generadas por el individuo en la determinación de la pérdida económica.  Por ello, adquiere especial relevancia el determinar qué constituyen ingresos o

---

[13] (Énfasis suplido.) Véase además, *Pate v. U.S.A.*, 120 D.P.R. 566, 570 (1988); *Ruiz Santiago v. E.L.A.*, 116 D.P.R. 306, 308 (1985).

ganancias del perjudicado cuando éste se dedica o dedicaba a la venta de seguros de vida, siendo su retribución las comisiones producto de las ventas. Por no existir dentro de nuestro acervo jurídico una norma que disponga de este asunto, recurrimos a la Ley Núm. 223 de 30 de noviembre de 1995, 13 L.P.R.A. sec. 8006 *et seq.*, conocida como el Código de Rentas Internas de 1994 (en lo sucesivo "el Código de Rentas Internas"), para así determinar análogamente cuál es el alcance del concepto de ingresos o ganancias dentro del contexto de un vendedor de seguros no asalariado.

La profesora Luz M. Vega Rivera define "ingreso" a los fines del Código de Rentas Internas, como "toda riqueza recibida por el contribuyente que no sea la mera restitución del capital. En términos generales, el ingreso es la ganancia derivada del capital y del trabajo, incluyendo la ganancia derivada de la venta o conversión de activos de capital."[15] Surge de esta definición que en industrias o negocios en los cuales se haga una inversión de capital, la ganancia obtenida constituirá el ingreso, y no el ingreso bruto que se genere.

Conforme a la sección 1023 del Código de Rentas Internas, 13 L.P.R.A. sec. 8423 (Supl. 2001), según enmendado, un contribuyente dedicado a una industria o negocio tendrá derecho a deducir en su planilla todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación del mismo.[16] Así, al rendir la planilla de contribución sobre ingresos, todo contribuyente cuyos ingresos provengan de la explotación de una industria o negocio deberá complementar el Anejo K de la denominada Forma Larga, en la cual hará constar los gastos de operación y otros costos necesarios esenciales en el manejo de la actividad económica concernida.[17] Entre las partidas de gastos que pueden ser deducidas, la Parte III

---

[14] Véase además, *Vda. de Silva v. Auxilio Mutuo*, 100 D.P.R. 30, 34 (1971).

[15] L.M. Vega Rivera, *Introducción a Contribuciones de Puerto Rico*, ed. 2002, sec. 3-4.

[16] En lo concernido, la sección 1023 del Código de Rentas Internas dispone lo siguiente:

> Al computarse el ingreso neto se admitirán como deducciones:
> (a) *Gastos.-*
>     (1) *Gastos de la industria o negocio.-*
>         (A) *En general.-*Todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de cualquier industria o negocio, incluyendo una cantidad razonable para sueldos u otra compensación por servicios personales realmente prestados; gastos de viaje, incluyendo el monto total gastado en comidas, hospedaje y entretenimiento, mientras se esté ausente de la residencia en asuntos relacionados con la industria o negocio, excepto aquellas sumas consideradas suntuosas o extravagantes ante las circunstancias, y conforme al límite establecido en la sec. 8424(e) de este título, y rentas u otros pagos que haya que hacer como una condición para continuar usando o poseyendo, para los fines de la industria o negocio, propiedad sobre la cual el contribuyente no ha adquirido o no está adquiriendo título o en la cual él no tiene participación. . . .
>     . . . .

[17] Planilla de Contribución sobre Ingresos de Individuos 2001, Forma Larga, Anejo K.

del anejo referido indica las siguientes: salarios, comisiones y bonificaciones a empleados; comisiones a negocios; gastos de nómina; aportación a planes de pensión; aportación a planes de ingreso diferido; intereses sobre deudas del negocio; alquiler pagado; contribuciones sobre la propiedad; otras contribuciones, patentes y licencias; seguros; anuncios; gastos de viajes; etc.

Entendemos que las deducciones al ingreso bruto por concepto de costos y gastos incurridos, permitidas al amparo de la sección 1023 del Código de Rentas Internas, *supra*, han sido concedidas dado el hecho de que una porción del ingreso bruto no es más que la recuperación del capital invertido. Es decir, respecto a los ingresos producto de una industria o negocio un individuo estará obligado a tributar sólo en cuanto a aquella porción que redunde en su beneficio personal o el de su familia.

Precisa que en la determinación de la pérdida económica de un agente de seguros no asalariado por concepto de lucro cesante, distingamos entre el ingreso bruto del negocio o industria y aquella partida que redunda en un beneficio real para el reclamante, en este caso el ingreso neto producto de la venta de seguros. Todo ingreso generado por un individuo en el curso de un negocio propio no constituye por sí mismo una ganancia atribuible a un perjudicado dentro del contexto de una determinación de lucro cesante. Ello es así, ya que como mencionáramos anteriormente, una porción de dicho ingreso constituye una recuperación del capital invertido o una partida previamente destinada a gastos de operación aún no sufragados.

No debemos perder de perspectiva que las acciones de daños a tenor del artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, tienen un propósito reparador y no punitivo. Conforme a ello, corresponde a los tribunales estimar y valorar las partidas de daños correspondientes, velando en todo momento que el perjudicado sea resarcido de forma justa y razonable sin que al conceder los mismos se castigue de una manera indirecta al demandado.

En síntesis, resolvemos que en la determinación de la pérdida económica de un agente de seguros no asalariado por concepto de lucro cesante, debe tomarse como base el ingreso neto de la industria o negocio como base para la estimación o valorización de los daños. Dicha base fue considerada como apropiada por el Tribunal Supremo del estado de Nueva York en *Neumann v. Metropolitan Tobacco Co.*, 20 Misc.2d 1013; 189 N.Y.S.2d 600 (Sup. Ct. 1959), y por la Corte de Apelaciones de Idaho en *Moeller v. Harshbarger*, 118 Idaho 92, 794 P.2d 1148 (Ct. App. 1990).[18] Al respecto, Marilyn Minzer y otros han expresado lo siguiente:

> [n]et, not gross, earnings are to be considered in assessing damages for loss of time or earning capacity. A salesman may be required to defray expenses such as travel, hotel and motel, telephone calls, and gasoline from commission earnings. Such expenses must be deducted from income in order to accurately reflect average earnings and arrive at a just measure of damages. However, the "net taxable income" on a tax return does not always reflect the actual net *earnings* of a commission salesman. Income tax return may reflect valid tax deductions such as

---

[18] Véase, además, S.M. Speiser *et al.*, *The American Law of Torts*, Rochester, New York, Ed. The Lawyers Co-Operative Publishing Co., 1985, Vol. 2, Sec. 8:27, pág. 635; L.R. Frumer y M.I. Friedman, *Personal Injury, Actions, Defenses, Damages*, Newark, N.J., Ed. Matthew Bender & Company, Inc., 2001, Vol. 9, Sec. 3.04[4][i].

> depreciation of an automobile which should not be deducted to determine actual lost earnings.  Such expenses are fixed costs, payable regardless of whether or not the salesman is injured. Thus, it is not always correct to resort to a salesman's income tax records in figuring actual loss.[19]

No obstante, en los casos de asalariados o personas que devengan un sueldo fijo, reiteramos la fórmula utilizada en el pasado para la estimación o valorización de la pérdida económica por concepto de lucro cesante, donde tomamos como base el ingreso bruto devengado como fruto de su trabajo. Véase, *Velázquez v. Ponce Asphalt,* supra; *Vda. de Seraballs v. Abella Hernández,* supra.

### IV

Los demás errores alegadamente cometidos, tanto por el TCA como por el TPI giran en torno a la apreciación de la prueba. Conforme expresáramos anteriormente, nos abstendremos de intervenir respecto a las cantidades concedidas por el foro de instancia, a menos que éstas sean ridículamente bajas o exageradamente altas. *Nieves Cruz v. U.P.R.*, supra; *Urrutia v. A.A.A.,* supra; *Publio Díaz v. E.L.A.*, supra, *Baralt v. Báez*, supra; *Rodríguez v. American Railroad Co.*, supra. Así, el peticionario deberá demostrar pasión, prejuicio, error manifiesto o parcialidad del foro recurrido al momento de hacer las determinaciones. *Colón González v. Tienda Kmart*, supra; *Trinidad García v. Chade,* supra; *Velázquez v. Ponce Asphalt*, supra. Entendemos que Nationwide no ha demostrado que éstos hayan incurrido en pasión, prejuicio, error manifiesto o parcialidad en la apreciación de la prueba ante sí.  Por el contrario, luego de haber examinado los autos, entendemos que las determinaciones realizadas por ambos foros están ampliamente sostenidas por la prueba.

Ya que el TPI estuvo en mejor posición para apreciar la prueba y por criterios de estabilidad y de respeto a los tribunales de primera instancia, nos abstenemos de intervenir en cuanto a los errores B, C, D y E señalados por Nationwide.

### V

Por las razones que anteceden, revocamos el dictamen del Tribunal de Circuito de Apelaciones y la Sentencia Sumaria emitida por el Tribunal de Primera Instancia en cuanto a la base utilizada en la determinación de la pérdida económica por concepto de lucro cesante, y confirmamos respecto a las demás determinaciones.

Se devolverá el caso al Tribunal de Primera Instancia para que calcule y adjudique las partidas de lucro cesante en armonía con lo aquí resuelto.

Se dictará sentencia de conformidad.

BALTASAR CORRADA DEL RÍO
Juez Asociado

---

[19] M. Minzer, *et al., Damages in Tort Actions*, New York, Ed. Matthew Bender Co., Inc., 1989, Vol. 2, Sec. 10.38, pág. 10-163.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eurípides Rodríguez Báez,
Liduvina Ríos Torres y la
Sociedad Legal de Gananciales
compuesta por Ellos y en
representación de su Hija
Menor, Lizarry Rodríguez Ríos

     Recurridos                    CC-2000-46        Certiorari

        v.

**Nationwide Insurance Company y Copy Corp.,
Inc.**

     **Peticionarias**

**SENTENCIA**

**San Juan, Puerto Rico a 18 de abril de 2002.**

     **Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente, se dicta sentencia revocando el dictamen del Tribunal de Circuito de Apelaciones y la Sentencia Sumaria emitida por el Tribunal de Primera Instancia en cuanto a la base utilizada en la determinación de la pérdida económica por concepto de lucro cesante, y se confirma respecto a las demás determinaciones.**

     **Se devuelve el caso al Tribunal de Primera Instancia para que calcule y adjudique las partidas de lucro cesante en armonía con lo aquí resuelto.**

     **Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri disiente por entender que la opinión mayoritaria no establece un criterio realmente correlativo para el cálculo del lucro cesante entre el trabajador no asalariado y el trabajador que devenga un sueldo fijo. Aunque concurre con el dictamen mayoritario en que existen diferencias importantes entre uno y otro trabajador que deben tomarse en cuenta al determinar el resarcimiento de sus respectivas pérdidas**

económicas, no le parece adecuado que en un caso se use el supuesto criterio de "ingreso neto" y en el otro el de "ingreso bruto", sobre todo si ello se refiere al significado de estos criterios en términos fiscales. El Juez Asociado señor Hernández Denton no interviene.


                                        Patricia Otón Olivieri
                                    Secretaria del Tribunal Supremo